IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA, for
the use of DELVAL EQUIPMENT
CORPORATION, INC.,

    *and*

DELVAL EQUIPMENT
CORPORATION, INC.,

    *Plaintiff*,

    v.

EAST COAST WELDING AND
CONSTRUCTION CO., INC., *et al*.,

    *Defendants*.

Civil Action No. ELH-21-1244

**MEMORANDUM OPINION**

This case arises under the Miller Act, 40 U.S.C. § 3131 *et seq.* Plaintiff is the United States of America, for the use of Delval Equipment Corporation, Inc., and Delval Equipment Corporation, Inc. ("Delval").[1] ECF 30 (the First Amended Complaint) (hereinafter, "Amended Complaint"). The case concerns several government construction contracts for the U.S. General Services Administration ("GSA"), with unrelated general contractors, for which Delval provided materials.[2]

Delval has sued NS & Associates, LLC ("NS&A"), a prime contractor for the GSA; QCM, Inc. ("QCM"), which is another prime contractor for the GSA; East Coast Welding and

---

[1] The parties essentially refer to Delval as the plaintiff.

[2] The Court may take judicial notice that the GSA is a federal agency that, among other things, "provides workplaces by constructing, managing, and preserving government buildings." *About Us*, GEN. SERVS. ADMIN., https://www.gsa.gov/about-us (last visited Feb. 23, 2022).

Construction Co., Inc. ("ECW"), a subcontractor; Christopher Brown, an ECW officer; The Fields Group, LLC (the "Fields Group"), another contractor; and the Pennsylvania National Mutual Casualty Insurance Company ("Pennsylvania National"), which provided a payment bond implicated in this dispute.  *Id.*

The suit contains fifteen claims: violation of the Miller Act, lodged against NS&A (Count I); breach of contract, against ECW (Count II); intentional misrepresentation, against ECW (Count III); negligent misrepresentation, against ECW (Count IV); negligence, against the Fields Group (Count V); a "Bond Claim," against Pennsylvania National (Count VI); constructive fraud, against Christopher Brown (Count VII); unjust enrichment, against ECW (Count VIII); quantum meruit, against ECW (Count IX); unjust enrichment, against NS&A (Count X); quantum meruit, against NS&A (Count XI); unjust enrichment, against QCM (Count XII); quantum meruit, against QCM (Count XIII); unjust enrichment, against the Fields Group (Count XIV); and quantum meruit, against the Fields Group (Count XV).  *See* ECF 30, ¶¶ 53-176.  Delval invokes federal question jurisdiction for its Miller Act claims (Count I and Count VI), and invokes supplemental jurisdiction for the remaining State law claims.  *See id.* at ¶¶ 8-9.

The original Complaint (ECF 1) was accompanied by eight exhibits.  ECF 1-1 to ECF 1-8. The Amended Complaint (ECF 30) includes three additional exhibits.  ECF 30-1 to ECF 30-3.[3]

ECW, Brown, and Pennsylvania National have jointly answered the Amended Complaint. ECF 39.  The Fields Group answered the original Complaint, although it has not answered the

---

[3] The Amended Complaint references the eight exhibits appended to the original Complaint, as well as the three new exhibits. Although the Amended Complaint describes the original exhibits as "attached," Delval did not include them with the Amended Complaint.

Amended Complaint.  ECF 25.[4]  In February 2022, the Fields Group also moved for summary judgment.  ECF 51.[5]

NS&A and QCM have both moved to dismiss the suit, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment.  NS&A's motion (ECF 35, the "NS&A Motion") is accompanied by seven exhibits.  ECF 35-1 to ECF 35-7.  QCM's motion (ECF 36, the "QCM Motion") is accompanied by five exhibits.  ECF 36-1 to ECF 36-5.  Delval opposes both motions.  ECF 37 (opposition to the NS&A Motion); ECF 38 (opposition to the QCM Motion).  And, NS&A and QCM have jointly replied in a single filing.  ECF 46.

No hearing is necessary to resolve the motions.  *See* Local Rule 105.6.  For the reasons that follow, I shall construe the motions as motions to dismiss and deny them.

## I. Factual Background[6]

This case involves the GSA; NS&A and QCM, both of which are prime contractors for the GSA; ECW, a subcontractor for both prime contractors; the Fields Group, another contractor that contracted with ECW; Delval, a materials supplier for ECW; and a surety, Pennsylvania National.

---

[4] The Court initially received correspondence from Leon Fields, president and CEO of the Fields Group, which appeared to be an attempt to respond to the Complaint. *See* ECF 14. The Court ordered the Fields Group to properly respond to the Complaint, through counsel. ECF 17.

[5] Given  recency of the filing and its distinct context, the Court has not attempted to integrate the facts asserted in the Fields Group's motion for summary judgment into this Memorandum Opinion.

[6] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). In addition to considering documents attached to, or incorporated into, the Amended Complaint, in the Rule 12(b)(1) context I may also consider documents outside of the pleadings. *See Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004). Therefore, when recounting the factual background, I cite to these outside documents. But, I do not consider them in the Rule 12(b)(6) context.

The Amended Complaint describes ECW as a "contractor for construction services serving federal, state, and local governmental agencies in Maryland and the District of Columbia." ECF 30, ¶ 12. According to the Amended Complaint, "ECW holds itself out as a welding and construction company that performs work throughout the North American region, including in Maryland and the District of Columbia." *Id.* ¶ 13. And, the Amended Complaint alleges that Brown is an "officer, director, or agent in control of ECW." *Id.* ¶ 3. Materials attached to the NS&A Motion and the ECW Motion identify Brown as the president of ECW. *See* ECF 35-4 at 2; ECF 36-3 at 2.

Of relevance here, ECW was a subcontractor for all the contractors. Delval was, in turn, a sub-subcontractor. According to the parties' submissions, however, there is substantial confusion regarding the particular projects for which Delval supplied materials to ECW.

In essence, Delval alleges that it supplied materials to ECW with the understanding that the materials were for a project for NS&A, and covered by a contract and a bond. However, Delval was not paid for the materials. And, it was subsequently informed that the order was for other, distinct contracts and projects, and not covered by the same bond. Because Delval "cannot be sure what contract it provided materials for," ECF 30, ¶ 52, Delval has sued several parties up and down the contractual chain, lodging multiple claims. As NS&A and QCM put it, Delval has filed suit "against the *entire kitchen sink*," *i.e.*, the "upstream contractors" on three projects. *See* ECF 35 (NS&A) at 2; ECF 36 (QCM) at 2 (emphasis in originals).

---

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. But, the electronic pagination does not always correspond to the page number imprinted on a particular submission.

At least two GSA contracts are implicated in this litigation. The first is Contract No. 47PM06-19-C-0009, between the GSA and NS&A. ECF 30, ¶¶ 11, 14.[7] This contract is described in the Amended Complaint as a contract to repair an economizer (*id.* ¶ 14), and is referred to in a separate subcontractor agreement between NS&A and ECW as a contract for "Central Heating and Refrigeration Plant Boiler #4 Tube Repairs." ECF 30-1 (original NS&A-ECW contract) at 1.[8] Correspondence from Brown, on behalf of ECW, to counsel for Delval describes this contract as involving "Economizer #2" at the Central Heating and Refrigeration Plant. ECF 35-5 (letter of February 10, 2021, from Brown to Gene Foehl) at 2. The Amended Complaint alleges that NS&A was required to furnish a payment bond for this project under the Miller Act, because it exceeded $100,000. ECF 30, ¶ 57.

In order to implement its contract with the GSA, NS&A entered into a subcontractor agreement with ECW on September 30, 2019, for a total sum of $566,984. *Id.* ¶ 15; *see* ECF 30-1 (original NS&A-ECW contract), at 1. The subcontractor agreement was amended on February 11, 2020, to "include Economizer #2," for an amended total of $993,840. ECF 1-1 (amended NS&A Contract) at 1. Both versions of the subcontractor agreement obligated ECW to "furnish and install required Supervision, Cleared Labor, materials, equipment, structural components . . . and all necessary items as needed to successfully complete the project." *Id.*; ECF 30-1 at 1.

---

[7] The contract between the GSA and NS&A has not been provided to the Court, nor has the Court been advised of the total dollar amount of the contract. The Amended Complaint alleges that the contract was worth a total of $993,840, but cites to the NS&A-ECW subcontractor agreement for that amount. ECF 30, ¶¶ 129-30.

[8] Neither the Amended Complaint nor the briefing defines the term "economizer." But, in this context, an economizer is a component of a boiler. *See, e.g.*, *Univ. of Notre Dame Du Lac v. English Boiler & Tube, Inc.*, No. 3:12-CV-418, 2014 WL 4261242, at *2 (N.D. Ind. Aug. 29, 2014) (defining an economizer as "'a heat recovery device designed to transfer heat from the products of combustion to boiler feedwater.'") (internal citation omitted).

On October 9, 2019, Pennsylvania National issued a "Subcontract Payment Bond."  ECF 1-2 (the "Bond" or the "Pennsylvania National Bond.").[9]  It is identified as "Bond No. SB 0611505."  ECF 1-2 at 5.  The Amended Complaint describes the Bond as a "payment bond for contract number 47PM06-19-C-0009."  ECF 30, ¶ 18.  It also describes the Bond as "the payment bond for purchase order 1745."  *Id.* ¶ 41.

The Bond specifies that Pennsylvania National is the "Surety"; ECW is the "Subcontractor"; and NS&A is the "Construction Manager."  ECF 1-2 at 5.  The amount of the Bond, and the amount of the "Subcontract," are listed as $566,984.  *Id.*  And, the "Project Description" states: "Contract Number 47PM06-19-C-0009, Central Heating and Refrigeration Plant Boiler #4 Tube Repairs Washington, DC."  *Id.*

The second contract is between the GSA and QCM, identified as Contract No. 47PM06-19-C-0005.  ECF 30, ¶ 147; ECF 30-3 (the QCM contract).  According to the Amended Complaint, the contract provided that QCM was to perform structural concrete repairs to the steam tunnel at the Central Heating and Refrigeration Plant, which was the same facility covered by the NS&A contract.  ECF 30, ¶ 147; *see also* ECF 30-3 at 4-16 (describing scope of work); ECF 35-7 (letter from counsel for NS&A to counsel for Delval, describing contract) at 2; ECF 36-5 (letter from counsel for QCM to counsel for Delval, describing contract) at 2.  The contract price was $689,883.  ECF 30-3 at 2.  The Amended Complaint alleges that QCM was required to furnish a payment bond for this project under the Miller Act, because the cost of the contract exceeded $100,000.  ECF 30, ¶ 148.

---

[9] The Bond also includes a "Subcontract Performance Bond" (ECF 1-2 at 1), which is not at issue here.

QCM entered into a contract with ECW in relation to QCM's contract with the GSA. *Id.* ¶¶ 29, 160, 164. Specifically, QCM and ECW entered into a "Short Form Subcontractor Agreement" on December 8, 2019, in the amount of $167,000. ECF 36-2 (QCM-ECW contract) at 1. Under this agreement, ECW agreed to "[p]rovide all labor, material, and equipment to Re-tube the #5 Economizer" as part of the "Steam Plant Equipment Repairs" project. *Id.* Later, on February 28, 2020, QCM and ECW agreed to a "Change Order" regarding their contract, under which ECW would "Re-tube the #1 Economizer, Supply and store tubes for 6 months." ECF 1-7 (QCM-ECW change order).[10] The Change Order increased the value of the contract by $96,096, for a total of $263,096. *Id.*

In addition, ECW entered into a separate contract with the Fields Group, under which ECW agreed "to supply tubing for an economizer repair." ECF 30, ¶ 28. This contract took the form of a "Subcontractor Agreement" between ECW and the Fields Group, dated March 3, 2020, for the amount of $123,019. ECF 1-8 (Fields contract). The Fields Group was the contractor, and ECW was the subcontractor. *Id.*

In the context of these various contracts and subcontracts, ECW contracted with Delval for all of them, by which Delval was to supply tubes for the various economizer projects. ECF 30, ¶ 20.[11] In particular, ECW issued two purchase orders to Delval: Purchase Order 1737 and Purchase Order 1745. *Id.* ¶¶ 21, 22; *see also* ECF 30-2 (Purchase Order 1737); ECF 1-3 (Purchase Order

---

[10] The Amended Complaint refers to the Change Order as the "contract." ECF 30, ¶ 29. But, it is clear from the content of the documents that it was an alteration of the original QCM-ECW contract, dated December 8, 2019.

[11] As discussed, *infra*, the parties have provided various purchase orders from ECW to Delval, and invoices issued by Delval corresponding to these purchase orders. Insofar as there are additional contractual documents between ECW and Delval, they have not been provided to the Court.

1745); ECF 35-4 at 3 (Delval invoice for Purchase Order 1737); ECF 1-6 (Delval invoice for Purchase Order 1745).

ECW's Purchase Order 1737 is dated February 19, 2020.  ECF 30-2.  It reflects an order from Delval for 256 "economizer tubes" and 24 "jumper tubes," for a total sum of $149,631.  *Id*. Under "Job Name," the purchase order states: "GSA #2 boiler."  *Id*.  Delval fulfilled Purchase Order 1737, and ECW paid Delval for this order.  ECF 30, ¶ 21.  In particular, ECW paid Delval via two checks, each with "1737" in the "Memo" line.  ECF 35-2 (the checks).  The first, dated March 27, 2020, is for $75,000.  *Id*. at 2.  The second, dated April 23, 2020, is for $90,408.  *Id*. at 3.  These checks total $165,408, which is the amount indicated in the invoice for Purchase Order 1737.  The invoice indicates that the amount in excess of $149,631 was due to freight and tax.  *See* ECF 35-4.

ECW's Purchase Order 1745 is at issue.  ECF 1-3.  It is dated March 3, 2020, and reflects an order from Delval for tubes, identical to Purchase Order 1737 in both quantity and price ($149,631).  *Id*.  Under "Job Name," the purchase order states: "GSA #1 boiler."  *Id*.  The "final invoice" (ECF 30, ¶ 42) for Purchase Order 1745 indicates a total amount due to Delval of $157,988.86, including freight and tax.  ECF 1-6.[12]

Delval alleges that it fulfilled Purchase Order 1745 by delivering the materials to ECW's place of business.  ECF 30, ¶¶ 22, 23.  "Upon information and belief," ECW received the materials and installed them pursuant to "the subcontractor agreement, as amended for [NS&A]."  *Id*. ¶ 37. However, Delval alleges that it has never been paid by ECW for the materials that are the subject

---

[12] This invoice appears to give a price, before freight and tax, of $142,631, rather than $149,631. *See* ECF 1-6. This discrepancy is not addressed by the parties, but is not at issue.

of Purchase Order 1745.  *Id*. ¶ 22.  Thus, Delval contends that, "[d]espite performance in full," a total of $157,988.86 is due and owing from ECW to Delval.  *Id*. ¶ 42.

The Amended Complaint refers to ECW's subcontract with NS&A, in relation to NS&A's work for the GSA, and alleges that ECW contracted with Delval "such that Delval would supply tubes for the Project."  *Id*. ¶ 20; *see also id*. ¶ 15.  And, "based on representations from ECW," Delval initially believed "that the project being performed was for" NS&A (*id*. ¶ 24), and that "it was providing materials to ECW for [NS&A] and to its knowledge no subcontract had been signed for a different project."  *Id*. ¶ 26; *see also* ¶¶ 30, 43.  Delval's source of information regarding both purchase orders was ECW alone; Delval did not install the materials or have any contact with NS&A.  *Id*. ¶¶ 24, 25.  And, when Delval fulfilled purchase orders 1737 and 1745, ECW "did not advise Delval that the purchase orders were for separate projects."  *Id*. ¶ 23.  Thus, "[i]f in fact Delval provided materials under a different project, Delval [claims that it] was wholly unaware." *Id*. ¶ 32.

After Delval fulfilled Purchase Order 1745, *id*. ¶ 27, "ECW alleged at some point to Delval that the purchase order 1745 was actually for separate contracts with [the Fields Group] and QCM," rather than for ECW's contract with NS&A.  *Id*. ¶ 26.  In particular, after "an inquiry from Delval," ECW presented Delval with ECW's contract with the Fields Group (*see* ECF 1-8), as well as the Change Order for ECW's contract with QCM.  ECF 30, ¶¶ 28, 29; *see* ECF 1-7.  However, Delval alleges that it was not aware of either of these contracts when supplying tubes to ECW. ECF 30, ¶¶ 28, 29.  Thus, when ECW "provided three (3) different contracts to Delval," it caused

"confusion," because Delval "believed that it was providing materials for one project" for NS&A. *Id.* ¶ 30.[13]

On September 23, 2020, Delval submitted to ECW its first "Notice of Intent to file a Claim on Bond." *Id.* ¶ 39; *see* ECF 1-4 (the "First Notice of Intent"). The First Notice of Intent, addressed to ECW, references Contract No. 47PM06-19-C-009, for "Central Heating and Refrigeration Plant Boiler #4 Tube Repairs," and states a total amount owed of $157,988.86. ECF 1-4 at 1. The First Notice of Intent included a copy of the Pennsylvania National Bond. *Id.* at 2.

Then, on January 28, 2021, counsel for Delval submitted a second "Notice of Intent to file a Claim on Bond" to ECW, NS&A, and Pennsylvania National. ECF 30, ¶ 40; *see* ECF 1-5 (the "Second Notice of Intent"). The Second Notice of Intent again referenced Contract No. 47PM06-19-C-009, for "Central Heating and Refrigeration Plant Boiler #4 Tube Repairs," and reflected a total amount owed of $157,988.86. ECF 1-5 at 1, 2. But, Pennsylvania National has yet to issue any payments under Bond No. SB 0611505. ECF 30, ¶ 41.

After Delval submitted its Second Notice of Intent, NS&A responded. According to the Amended Complaint, Nicole Smith, on behalf of NS&A, sent Delval an email on February 22, 2021. *Id.* ¶ 44.[14] The email enclosed a copy of the amended subcontractor agreement between NS&A and ECW, as well as the Pennsylvania National Bond. *Id.* The email did not state that Purchase Order 1745 related to another project. *Id.* According to the Amended Complaint, the purchase orders "are presumably related to the [subcontractor agreement between NS&A and

---

[13] The Amended Complaint does not specifically identify the third contract (in addition to the Fields Group and QCM documents) that ECW provided to Delval, although it seems likely that it was ECW's contract with NS&A.

[14] The Amended Complaint does not include copies of these communications.

ECW] and the logical conclusion" is that the amendment to the agreement of February 11, 2020, "resulted in the additional purchase order 1745 for materials." *Id.*

On February 25, 2021, John Steele, on behalf of NS&A, sent Delval a copy of the original subcontractor agreement between NS&A and ECW. *Id.* ¶ 45. "Steele claimed that Delval admitted that its unpaid invoice related to Boiler #2 and not Boiler #4 for the Central Heating and Refrigeration Plant Project which was covered by the bond that was issue[d] by Pennsylvania National." *Id.*

Delval notes that it reviewed both versions of the NS&A-ECW subcontractor agreement and, in particular, Section 7.1 of the agreement. *Id.* ¶¶ 34, 35. This provision, in both versions, provides that NS&A may "either unilaterally or by direction of Owner, without notice to sureties, make changes in the work covered by this Subcontract at any time." ECF 1-1 at 4; ECF 30-1 at 4. Delval contends that, given this provision, it was reasonable for Delval to believe that "any change in contract or additional purchase order requested by ECW would be under the same project and covered by an increase in any bond." ECF 30, ¶ 36.[15]

"However, subsequent to non-payment [NS&A] inexplicably started to advise that it had not contracted with ECW for the work owed and that it had fully paid." *Id.* ¶ 47. Delval alleges that it was not advised of any change in contractors by ECW "and thus was led to believe it was providing such work under the same project." *Id.* ¶ 48. It asserts: "Due to ECW's obfuscation and misleading comments Delval was induced to perform additional work without the knowledge of exactly who the work was performed for," whether NS&A, QCM, or the Fields Group. *Id.* ¶ 49.

---

[15] The Amended Complaint misquotes this provision as stating that NS&A may "either unilaterally or without notice to sureties, make changes in the work covered by this Subcontract at any time." ECF 30, ¶ 35.

And, Delval claims that it "cannot be sure what contract it provided materials for other than ECW because it has been presented with multiple contracts." *Id*. ¶ 52.

As noted, this uncertainty also relates to the question of whether the Pennsylvania National Bond applies to Purchase Order 1745. Delval alleges that it "reasonably assumed that the bond would have been increased to cover both purchase orders for work performed on the Central Heating and Refrigeration Plant Project, or that an additional bond was procured." *Id*. ¶ 46. Further, plaintiff claims that it "was led to believe it was providing such work . . . with the same protections of a Bond as originally promised by ECW." *Id*. ¶ 48.

Furthermore, the Amended Complaint alleges that ECW had provided Delval the amended subcontractor agreement between NS&A and ECW and asserted that "because it was bonded for both the general contractors and sub-contractors GSA would not pay a deposit on the contract." *Id*. ¶¶ 70, 71. The Amended Complaint describes this as an assertion that the contract for which Purchase Order 1745 applied was covered by the Bond. *Id*. ¶ 74. But, "ECW subsequently indicated that the bond did not apply to purchase order 1745." *Id*. ¶ 76. Similarly, the Amended Complaint alleges that Brown "represented to Delval that the GSA project for which Delval supplied the tubes [under Purchase Order 1745] was covered by performance and payment bonds as required by law," but that Brown "subsequently indicated that the job associated with purchase order 1745 was in fact not covered by the requisite performance and payment bonds." *Id*. ¶¶ 110, 111.

Communications with Delval provided in the NS&A Motion and the QCM Motion, but not in the Amended Complaint, further illuminate the dispute.[16] In a letter dated September 29, 2020,

---

[16] I may consider these communications in the Rule 12(b)(1) context, but not in the Rule 12(b)(6) context.

Brown, on behalf of ECW, wrote to Delval's controller, Jim Hoffman, in response to Delval's First Notice of Intent.  ECF 35-4.  Brown stated that the "attached bond" (*i.e.*, the Pennsylvania National Bond) was for Purchase Order 1737, which ECW had paid.  *Id*. at 2.  But, Purchase Order 1745 "is not the job on which this Bond was written.  There was no Bond on the second order."  *Id*.

Then, in a more detailed letter of February 10, 2021, Brown, on behalf of ECW, wrote to Delval's counsel, Gene Foehl, in response to Delval's Second Notice of Intent.  ECF 35-5.  Brown explained that the Pennsylvania National Bond is applicable "only" to Contract No. 47PM06-19-C-009, for "Boiler #4 Tube Repairs and Economizer #2 projects located at the Central Heating and Refrigeration Plant in Washington DC."  *Id*. at 2.  Purchase Order 1737, which had been paid, was for "Economizer #2 tubes."  *Id*.  But, unpaid Purchase Order 1745 was for "Economizer #1 tubes." *Id*.  According to Brown, ECW "signed contracts with [QMC] and [the Fields Group] to supply tubes for [the] Economizer #1 project, which is also located at the Central Heating and Refrigeration Plant in Washington DC."  *Id*.  Brown asserted that Delval "chose to record" Purchase Order 1745 as part of the Purchase Order 1737 contract, but that "[t]hey did so in error, and apparently it is causing some confusion."  *Id*.  After asserting that there is "no bond" for the Purchase Order 1745 transaction, Brown concluded: "Please do not use the Bond relative to GSA Contract No. 47PM0619C0009 for Purchase Order #1745."  *Id*.

Thereafter, on February 12, 2021, Nicole Smith of NS&A emailed Foehl with regard to the Second Notice of Intent.  ECF 35-6 (email thread) at 3.  Smith asserted: "The $157,988.86 owed for materials provided by Delval Equipment Corporation [*i.e.*, in Purchase Order 1745] was not related to [NS&A's] Contract No. 47PM06-19-C-0009."  *Id*.  She explained that NS&A had received Delval's First Notice of Intent, at which point NS&A "immediately" reached out to Brown, asking him to respond Delval to "clarify" Delval's "inaccuracy."  *Id*.  Smith then

described Brown's letter to Delval of September 29, 2020. *Id*. Smith asked Foehl to call her "so that [they could] discuss Delval's error in associating [her] contract and bond with their outstanding balance with [ECW] that is associated with another entirely unrelated project at the Central Heating and Refrigeration Plant." *Id*.

Smith and Foehl appear to have subsequently talked on the phone. *Id*. at 2. Foehl then sent Smith a follow up email on February 16, 2021, requesting copies of the "referenced full agreement between [ECW] and NS&A," the "referenced full agreement between [ECW] and QMC and The Fields Group," and copies of the surety bonds for each. *Id*. On February 22, 2021, Smith responded to Foehl, stating that she had "sent a copy of the full agreement between [ECW] and NS&A as well as a copy of the bond," but that she did not have access to any additional agreements between ECW, QMC, and the Fields Group. *Id*.

As noted, according to the Amended Complaint, on February 22, 2021, Smith sent Delval an email containing the amended NS&A-ECW subcontractor agreement and the Pennsylvania National Bond. ECF 30, ¶ 44. This does not appear to be a reference to the email from Smith contained in the NS&A Motion (*see* ECF 35-6 at 2), as the language of the email in the Amended Complaint is slightly different. However, the content of the two emails appears to be very similar, and they were sent on the same date. In any case, the Amended Complaint alleges that, in her email of February 22, 2021, Smith did not indicate that Purchase Order 1745 was for another project. ECF 30, ¶ 44. However, Smith's email to Delval's counsel on February 12, 2021, appears to have indicated that Purchase Order 1745 was, in fact, for a different project. *See* ECF 35-6 at 3.

Additional facts are included in the Discussion, *infra*.

## II.  Standard of Review

### A. Summary Judgment Standard

As noted, the Motion is styled as a "Motion to Dismiss Or In the Alternative For Summary Judgment."  ECF 13.  A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[17]

---

[17] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed. 2018). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*.

Summary judgment is usually inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. de Pont de Nemours and Co. v. Kolon Indus., Inc*., 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Financial*, 514 Fed. App'x

378 (4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit…is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods*, 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).

Delval has not filed a Rule 56(d) affidavit.  However, at various points in its opposition briefing, Delval makes clear that it believes there are disputed questions of fact for which discovery is appropriate.  In particular, Delval argues that its quantum meruit and unjust enrichment claims present "precisely the type of situation where discovery will reveal all the evidence necessary for Delval to determine whether NS, QCM, and/or Fields received the benefits of the materials provided to ECW."  ECF 37 at 10; ECF 38 at 9.  Elsewhere, Delval states that there are "many questions of fact" in this case.  ECF 37 at 2; ECF 38 at 2.

I conclude that conversion to summary judgment, without the benefit of discovery, would be premature.  As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask."  *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam).

The recitation of the factual background to this case makes clear that there are a number issues of disputed fact in this litigation, such as the particular contract and prime contractor implicated by Delval's work under Purchase Order 1745, and what ECW and Brown communicated to Delval regarding this purchase order.  Therefore, I will construe the NS&A Motion and the QCM Motion as motions to dismiss.  However, when resolving the motions' Rule 12(b)(1) arguments I may consider evidence outside the pleadings and need not take the allegations in the Amended Complaint as true.

### B. Rule 12(b)(1)

Federal district courts are courts of limited jurisdiction; they possess "'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 586 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)); *see Home Depot U.S.A.,*

*Inc. v. Jackson*, ___ U.S. ___, 139 S. Ct. 1743, 1746 (2019); *Exxon Mobil Corp. v. Allapattah Servs., Inc*., 545 U.S. 546, 552 (2005).  Simply put, "if Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed." *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 432 (4th Cir. 2014); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'") (citation omitted).  "Because jurisdictional limits define the very foundation of judicial authority, subject matter jurisdiction must, when questioned, be decided before any other matter." *United States v. Wilson*, 699 F.3d 789, 793 (4th Cir.2012).

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a defendant to challenge the court's subject matter jurisdiction over the plaintiff's suit.  Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc*., 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty*., 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999).  However, a court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *B.F. Perkins*, 166 F.3d at 647 (citation omitted).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *accord Hutton v. Nat'l Bd. of Exam'rs Inc*., 892 F.3d 613, 620-21 (4th Cir. 2018). In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction."  *Kerns*, 585

F.3d at 192; accord *Clear Channel Outdoor, Inc. v. Mayor and City Council of Baltimore*, 22 F. Supp. 3d 519, 524 (D. Md. 2014).  In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction."  *Kerns*, 585 F.3d 192. In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

Here, the NS&A Motion and the QCM Motion present a factual challenge, namely to the claim that the Pennsylvania National Bond constitutes a Miller Act bond adequate to grant the Court subject matter jurisdiction.  *See* ECF 35 at 8-10; ECF 36 at 8-9.  Accordingly, the Court may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.

### C. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a

plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of

relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336

(4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

And, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon

which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.*  Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment.  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).  In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*,

565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Applying these principles, I may consider the documents appended to the Amended Complaint, or incorporated by the Amended Complaint. *See* ECF 1-1 to ECF 1-8; ECF 30-1 to ECF 30-3.[18] In addition, I may consider the following documents attached to the NS&A Motion, because they are referenced in the Amended Complaint or otherwise integral to Delval's claims, their authenticity is not disputed, and Delval does not take issue with their consideration: ECW's checks made out to Delval for the payment of Invoice 1737 (ECF 35-2), and GSA Contract No. 47PM06-19-C-0005 (ECF 35-3). On the same grounds, I may consider the following documents attached to the QCM Motion: GSA Contract No. 47PM06-19-C-0005, which is the same document attached to the NS&A Motion (ECF 36-1), and the contract between ECW and QCM. ECF 36-2. In the Rule 12(b)(6) context, however, I may not consider the other documents attached to the motions.

### III. Discussion

Both the NS&A Motion and the QCM Motion argue, pursuant to Rule 12(b)(1), that the Court lacks subject matter jurisdiction because the Pennsylvania National Bond is not a Miller Act bond, and the Miller Act provides the basis for federal question jurisdiction in this case. ECF 35

---

[18] As noted, where the Amended Complaint referenced an exhibit previously submitted with the original Complaint, Delval did not resubmit the exhibit with the Amended Complaint.

at 8-10; ECF 36 at 8-9.[19]  And, under Rule 12(b)(6), both the NS&A Motion and the QCM Motion contend that the Amended Complaint fails to state a claim for quantum meruit and unjust enrichment.  ECF 35 at 11-13; ECF 36 at 9-11.  In addition, the NS&A Motion argues that Count I, the Miller Act claim against NS&A, should be dismissed for failure to state a claim because Delval is attempting to recover payment from an unrelated third party.  ECF 35 at 10-11.

## A. Subject Matter Jurisdiction

### 1.

As noted, federal courts are courts of limited jurisdiction.  *Hanna*, 750 F.3d at 432 (quotation marks omitted) (citing *Kokkonen*, 511 U.S. at 377).  Thus, a federal district court may adjudicate a case only if it possesses the "power authorized by Constitution and statute." *Allapattah Servs., Inc*., 545 U.S. at 552 (internal quotation marks omitted).  As the Fourth Circuit stated in *Strawn v. AT&T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008), if a party seeks to proceed in federal court, it "must allege and, when challenged, must demonstrate the federal court's [subject matter] jurisdiction over the matter."

Notably, "[a] court is to presume . . . that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper."  *United States v. Poole*, 531 F.3d 263, 274 (4th Cir. 2008) (citing *Kokkonen*, 511 U.S. at 377).  Even where no party challenges subject matter jurisdiction, a federal court has "an independent obligation to determine whether subject-matter jurisdiction exists."  *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).  And, "if Congress has not empowered the federal judiciary to hear a matter, then the case must be dismissed."  *Hanna*, 750 F.3d at 432.

---

[19] I discuss, *infra*, the nature of a Miller Act bond.  But, for present purposes, the Miller Act requires a contractor to furnish a payment bond.

Congress has conferred jurisdiction on the federal courts in several ways.  Of relevance here, to provide a federal forum for plaintiffs who seek to vindicate federal rights, Congress has conferred on the district courts original jurisdiction over civil actions that arise under the Constitution, laws, or treaties of the United States.  *See* 28 U.S.C. § 1331; *see also Allapattah Servs., Inc.*, 545 U.S. at 552; *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012); U.S. Constitution Art. III, § 2 ("The Judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made ...").  This is sometimes called federal question jurisdiction.

Section 1367(a) of 28 U.S.C. concerns "supplemental jurisdiction" in federal court.  This provision grants "supplemental jurisdiction over all other claims that are so related to claims in the action within [the courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

Under the "well-pleaded complaint" rule, facts showing the existence of subject matter jurisdiction "must be affirmatively alleged in the complaint."  *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999) (citing *McNutt v. Gen'l Motors Acceptance Corp.*, 298 U.S. 178 (1936)).  Put another way, "before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court."  *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006).  This means that "a claim of federal question jurisdiction is to be resolved on the basis of the allegations of the complaint itself."  *Burgess v. Charlottesville Sav. & Loan Assoc.*, 477 F.2d 40, 43 (4th Cir. 1973).  Therefore, a complaint must contain allegations "'affirmatively and distinctly' establishing federal grounds[ ] 'not in mere form, but in substance' and 'not in mere assertion, but in essence and effect.'"  *Id.* (citations omitted).

Moreover, the "burden of establishing subject matter jurisdiction is on . . . the party asserting jurisdiction." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010); accord *Hertz*, 599 U.S. at 95; *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010). And, "the mere assertion in a pleading that the case is one involving the construction or application of the federal laws does not authorize the District Court to entertain the suit' . . ." *Burgess*, 477 F.2d at 43 (citations omitted).

A plaintiff properly invokes federal question jurisdiction under 28 U.S.C. § 1331 "when she pleads a colorable claim 'arising under' the Constitution or laws of the United States." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006). And, "the subject matter jurisdiction of a federal court is not generally resolved by concluding that the plaintiff has failed to allege an element of a federal cause of action or that the plaintiff might not be able to prove an element of a federal cause of action." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012). Thus, "the failure to state the elements of a federal claim can form the basis of a Rule 12(b)(1) motion 'only when the claim is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)); *see also Bell v. Hood*, 327 U.S. 678, 682 (1946).

**2.**

Delval asserts federal question jurisdiction on the basis of the Miller Act. *See* ECF 30, ¶¶ 8, 53-62, 96-105; *see also* 40 U.S.C. § 3133. In particular, Count I (ECF 30, ¶¶ 53-63), against NS&A, asserts a violation of the Miller Act, 40 U.S.C. § 3131, while Count VI (ECF 30, ¶¶ 96-105) asserts a "Bond Claim" against Pennsylvania National, also premised on the Miller Act. As the motions note (ECF 35 at 8; ECF 36 at 8), and as Delval does not appear to dispute (ECF 37 at

5; ECF 38 at 5), these are the sole counts that provide the basis for the Court's federal question jurisdiction.  The 13 remaining counts are all State law claims brought pursuant to the Court's supplemental jurisdiction.  *See* ECF 30, ¶ 9; *see also* 28 U.S.C. § 1367.

Both the NS&A and QCM motions argue that the bond discussed in the Amended Complaint, the Pennsylvania National Bond, is not a bond within the meaning of the Miller Act. And, without such a bond, Delval may not assert federal question jurisdiction under the Miller Act. Because this argument is a factual challenge under Rule 12(b)(1), the Court may consider evidence outside the pleadings, and need not take the allegations in the Amended Complaint as true.

Defendants' argument has broad significance.  As noted, the Court may exercise jurisdiction over the remaining State law claims only through its supplemental jurisdiction.[20] Thus, if the Court lacks subject matter jurisdiction as to Counts I and VI, it must dismiss the other claims as well.[21]  *See, e.g.*, *Allapattah Servs., Inc.*, 545 U.S. at 554 (noting that "once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over additional claims"); *Arena v. Graybar Elec. Co., Inc.*, 669 F.3d 214, 220-22 (5th Cir. 2012) (when district court lacked federal question jurisdiction over Miller Act claim because there was no Miller Act bond, it also lacked supplemental jurisdiction).

Delval notes that the surety, Pennsylvania National, has answered the Amended Complaint rather than move for dismissal under Rule 12(b)(1), even though Count VI, one of the federal

---

[20] Delval does not invoke diversity jurisdiction, presumably because both Delval and Pennsylvania National appear to be citizens of Pennsylvania. *See* ECF 30, ¶¶ 1, 4. And, diversity jurisdiction "requires complete diversity among parties, meaning that the citizenship of every plaintiff must be different from the citizenship of every defendant." *Cent. W. Va. Energy Co., Inc. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011).

[21] Here, federal question jurisdiction is the only possible basis for subject matter jurisdiction.

question claims, is lodged against Pennsylvania National.  ECF 37 at 6; ECF 38 at 6.  It asserts

that this means that the Court maintains subject matter jurisdiction.  But, as discussed, this Court

has an ongoing and independent obligation to determine if subject matter jurisdiction exists.  *See*

*Hertz Corp.*, 559 U.S. at 94.  Indeed, even if no party raises the issue, the Court may do so *sua*

*sponte*, and determine whether subject matter jurisdiction exists.  *See id*.  The fact that only certain

parties have raised the issue of subject matter jurisdiction does not preclude the Court from

considering the question.

Therefore, I turn to the basis for federal question jurisdiction: the Miller Act.  This statute,

40 U.S.C. § 3131 *et seq*., imposes certain obligations on the prime contractor on any "contract of

more than $100,000 . . . for the construction, alteration, or repair of any public building or public

work of the Federal Government."  40 U.S.C. § 3131(b).

Of import here, the Miller Act requires the contractor to furnish a payment bond, through

a satisfactory surety, "for the protection of all persons supplying labor and material in carrying out

the work provided for in the contract."  *Id*. § 3131(b)(2).  *See also Aarow Equipment & Servs., Inc.*

*v. Travelers Cas. and Surety Co. of America*, 417 Fed. App'x 366, 367 (4th Cir. 2011) (per

curiam).[22]  The Miller Act "is to be given a liberal construction 'in order properly to effectuate the

Congressional intent to protect those whose labor and materials go into public projects.'"  *United*

*States for the Use of Sunbelt Pipe Corp. v. U.S. Fidelity and Guar. Co.*, 785 F.2d 468, 470 (4th

Cir. 1986) (citation omitted).

In *F.D. Rich Co., Inc. v. United States f/u/o Indus. Lumber Co., Inc.*, 417 U.S. 116, 122

(1974), the Supreme Court explained that, ordinarily, a supplier of labor or materials on a private

---

[22] The law also requires the contractor to furnish a performance bond "for the protection of
the Government." 40 U.S.C. § 3131(b)(1). No performance bond is at issue here.

construction project could obtain a mechanic's lien, but such a lien "cannot attach to Government property." (Citing *Illinois Surety Co. v. John Davis Co*., 244 U.S. 376, 380 (1917)). Because suppliers on government projects "are deprived of their usual security interest," the Miller Act "was intended to provide an alternative remedy to protect the rights of these suppliers." *F.D. Rich Co., Inc*., 417 U.S. at 122. And, in *U.S. for Benefit & on Behalf of Sherman v. Carter*, 353 U.S. 210, 216-17 (1957), the Supreme Court said:

> The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of nonfederal buildings. The essence of its policy is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material. Thus the Act provides a broad but not unlimited protection.[ ]

To achieve these purposes, the Miller Act authorizes any "person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material" to bring "a civil action on the payment bond." 40 U.S.C. § 3133(b)(1).

Furthermore, the law authorizes any "person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond" to bring a civil action "on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made." *Id*. § 3133(b)(2).

In other words, the law "authorizes suits by two classes of claimants: '(1) those materialmen, laborers and subcontractors who deal directly with the prime contractor and (2) those materialmen, laborers and sub-contractors who, lacking [an] express or implied contractual relationship with the prime contractor, have [a] direct contractual relationship with a subcontractor

31

and who give the statutory notice of their claims to the prime contractor.'" *State Construction Corp. v. Slone Associates, Inc.*, 385 F. Supp. 3d 449, 458 (D. Md. 2019) (quoting *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107-08 (1944)) (alterations in *State Construction Corp.*).

Any civil action under § 3133 must be filed "in the name of the United States for the use of the person bringing the action." *Id.* § 3133(b)(3)(A). And, any such action must be brought "in the United States District Court for any district in which the contract was to be performed and executed, regardless of the amount in controversy." *Id.* § 3133(b)(3)(B). An action brought under 40 U.S.C. § 3133(b) "must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." *Id.* § 3133(b)(4).

"Federal law, not state statute or common law principles, controls in Miller Act suits." *United States for Use and Benefit of Tusco, Inc. v. Clark Constr. Grp., LLC*, 235 F. Supp. 3d 745, 756, n.13 (D. Md. 2016); *see F.D. Rich Co., Inc.*, 417 U.S. at 127 ("The Miller Act provides a federal cause of action, and the scope of the remedy as well as the substance of the rights created thereby is a matter of federal not state law."). But, where the question is one of contract interpretation and not the construction of the Miller Act itself, courts look to State law. *See United States for Use and Benefit of Shields, Inc. v. Citizens & S. Nat. Bank of Atlanta, Ga.*, 367 F.2d 473, 477 (4th Cir. 1966); *see also United States v. Hartford Accident & Indem. Co.*, 168 F. Supp. 3d 824, 832 (D. Md. 2016).

As the text of the statute reflects, the ability to bring a civil suit under the Miller Act is predicated on "a contract for which a payment bond is furnished under section 3131." 40 U.S.C. § 3133(b)(1). And, a "payment bond . . . furnished under section 3131" is "[a] payment bond . . . for the protection of all persons supplying labor and material in carrying out the work provided for

in the contract," and "furnish[ed] to the Government."  *Id.* § 3131(b).  In other words, a payment bond, as defined by section 3131(b), must exist for a Miller Act case to proceed.

Although I am not aware of a Fourth Circuit case speaking directly to the issue of jurisdiction, courts have generally held that this requirement of a payment bond is a jurisdictional one.  *See, e.g.*, *Arena*, 669 F.3d at 220 ("The Miller Act itself does not explicitly mention that a bond is necessary to maintain jurisdiction under the statute. Federal case law, however, has established that a claim under the Miller Act cannot be maintained without it."); *United States for Use and Benefit of Gen. Rock & Sand Corp. v. Chuska Dev. Corp.*, 55 F.3d 1491, 1493-95 (10th Cir. 1995) (finding no subject matter jurisdiction when letter of credit did not qualify as a Miller Act bond); *United States for Use and Benefit of Superior Systems, Inc. v. Levy Wrecking Co., Inc.*, 21 F.3d 433, 1994 WL 142113, at *1 (8th Cir. Apr. 22, 1994) (per curiam) (considering as issue of subject matter jurisdiction whether Miller Act bond existed); *Asbestos Abatement Contractors, Inc. v. Home Guard Environmental Restoration Services, Inc.*, No. 11-3118, 2012 WL 1664549, at *2-5 (E.D. La. May 11, 2012) (dismissing suit, for lack of subject matter jurisdiction, after finding no Miller Act bond); *United States for Use and Benefit of Owens v. Olympic Marine Services, Inc.*, 827 F. Supp. 1232, 1234 n.1 (E.D. Va. 1993) ("If the facts eventually show . . . that no bond ever issued on this contract, then this court will not have subject matter jurisdiction. The Miller Act gives federal courts jurisdiction over cases involving government contracts, only if bonds have been given.") (internal citation omitted); *United States to Use of Acme Furnace Fitting Co. v. Fort George G. Meade Defense Housing Corp. No. 1*, 186 F. Supp. 639, 643-45 (D. Md. 1960) (finding no subject matter jurisdiction when bond not Miller Act bond).

Indeed, as the Fifth Circuit noted in *Arena*, 669 F.3d at 220, "satisfaction of the bond requirement to establish proper jurisdiction goes back for many years."  Judge Cardozo, while

sitting on the New York Court of Appeals, remarked, in a case concerning the federal statute that was the predecessor to the Miller Act:

> Congress has said that contractors shall be made liable to materialmen and laborers in an amount to be made determinate by the giving of the bond. The statutory liability, which in turn is inseparably linked to the statutory remedy, assumes the existence of a bond as an indispensable condition. Till then, there is neither federal jurisdiction nor any right of action that can rest upon the statute.

*Strong v. American Fence Construction Co.*, 245 N.Y. 48, 52-53, 156 N.E. 92, 93 (1927).

**3.**

NS&A and QCM argue that the Pennsylvania National Bond at issue in this case is a subcontractor bond, not a Miller Act bond.

The Pennsylvania National Bond relates to the project for which NS&A contracted with the GSA. It is titled "Subcontractor Payment Bond." The Bond involves ECW as the "subcontractor as principal," NS&A, and Pennsylvania National as surety. ECF 1-2 at 5. It was not "furnish[ed] to the Government," 40 U.S.C. § 3131(b), and it does not relate to the prime contract as a whole. As NS&A and QCM accurately note, "[t]he Government is not the obligee, principal, or in any way named as a party to the Payment Bond, and as such the Payment Bond does not run to the benefit of the United States." ECF 35 at 9; ECF 36 at 9.

*Asbestos Abatement Contractors, Inc.*, 2012 WL 1664549, which is cited by NS&A and QCM, is instructive. In that case, the plaintiff, a sub-subcontractor, sued the defendant, a subcontractor, on a payment bond posted by the defendant and listing the prime contractor as the obligee. *Id*. at *1. The plaintiff argued that it could bring a Miller Act suit based on this bond. *Id*. at *4. But, the district court held that it lacked subject matter jurisdiction because the suit was not instituted on the general contractor's bond, as the Miller Act requires, and the plaintiff had "fail[ed] to establish, let alone plead, the existence of a payment bond between the general contractor and

the United States that could provide jurisdiction under the Miller Act." *Id*. at *5. The court noted: "[T]he plain language of the statute makes clear that the Miller Act provides a cause of action only on the payment bond between the general contractor and the United States." *Id*. at *4 (collecting cases).

Here, as in *Asbestos Abatement Contractors*, the Pennsylvania National Bond is not the payment bond between NS&A, as the general contractor, and the United States. Rather, it is what it says—a subcontractor payment bond. *See* ECF 1-2 at 5.

*Acme Furnace*, 186 F. Supp. 639, is also relevant. In that case, the supplier of materials to a subcontractor sued the defendant, a contractor, under the Miller Act. *Id*. at 641-43. The court held that the payment bond cited to invoke the Miller Act "is not a technical Miller Act bond as it does not come within either the letter or the intent of the Miller Act." *Id*. at 643. In particular, the bond ran in favor of the defendant, not the United States, and "in the case of [Miller Act] bonds the United States shall be named as sole obligee, a condition not herein met." *Id*. at 644.[23]

Several other cases are consistent with the proposition that a subcontractor bond, such as this one, does not constitute a Miller Act bond. *See, e.g.*, *Superior Systems, Inc.*, 1994 WL 142113, at *1 ("While we have recognized that sub-sub-contractors are entitled to recover under the Miller Act, their right to sue has traditionally been limited to suit on the prime contractor's payment bond."); *Mo-Kan Iron Workers Pension Fund v. Travelers Cas. and Sur. Co.*, No. 12-cv-2490-JAR, 2012 WL 5933064, at *4 (D. Kan. Nov. 27, 2012) ("[T]he structure of the Act, which allows a person having a direct contractual relationship with a subcontractor but no relationship with the contractor to still recover against the contractor, envisions Miller Act bonds posted only by the

---

[23] The court went on to hold that jurisdiction might exist on other bases not applicable here. *Acme Furnace*, 186 F. Supp. at 652-53.

prime contractor."); *U.S. ex rel. Integrated Protection Services, Inc. v. TK Elec. Services, LLC*, No. 1:09-cv-41, 2010 WL 5691669, at *4 (S.D. Ohio Dec. 20, 2010) ("The second key element of the Miller Act is that a bond be issued in favor of the United States. Where the bond in question is issued in favor of a party different than the United States or one of its agencies, the Miller Act will not apply."); *United States v. U.S. Fidelity & Guar. Co.*, 959 F. Supp. 345, 347 (E.D. La. 1996) (noting that "the Miller Act specifically requires that the payment bond be furnished to the United States," but the bond in question was furnished to a contractor); *United States for Use and Benefit of Capps v. Fidelity and Deposit Co. of Md.*, 875 F. Supp. 803, 808 (M.D. Al. 1995) ("By statute, the payment bond must run to the benefit of the United States, and subcontractors and suppliers are permitted to sue on the bond in federal court in the name of the United States.").

In its opposition briefing, Delval does not advance any specific argument that the Pennsylvania National Bond is, in fact, a Miller Act bond. *See* ECF 37 at 3-6; ECF 38 at 3-6. Delval contends that, "even if Delval filed suit under the wrong bond, this Court absolutely has the authority to maintain jurisdiction over the general contractor." ECF 37 at 6; ECF 38 at 6. But, neither of the two cases cited for this assertion support the idea that the Court may maintain jurisdiction over a case where a Miller Act bond is not involved at all.

In *United States for Use and Benefit of Statham Instruments, Inc. v. Western Cas. & Sur. Co.*, 359 F.2d 521 (6th Cir. 1966), the plaintiff sued the prime contractor and the company that it thought had provided the bond. *Id*. at 522; *see also Owens*, 827 F. Supp. at 1234 (describing *Statham Instruments*). The district court dismissed the putative surety because it had not, in fact, provided the bond, but maintained jurisdiction against the prime contractor. *Statham Instruments, Inc.*, 359 F.2d at 522; *Owens*, 827 F. Supp. at 1234. The plaintiff then tried to add the proper surety. But, the Fourth Circuit concluded that the district court should have dismissed the claim

against the proper surety because the statute of limitations had run.  *Statham Instruments, Inc.*, 359 F.2d at 522-24.

In considering the *Statham Instruments* case, the district court in *Owens* noted, 827 F. Supp. at 1234 n.1: "There was no question in *Statham* about the existence of a bond."  Rather, the uncertainty was as to which entity provided the bond.  And, in *Owens*, the defendant contended that no bond existed on the contract in question.  *Id*. at 1234 n.1, 1234-35.  Although the district court declined to reach that issue at the motion to dismiss stage, the court was clear that, "[i]f the facts eventually show, as the defendant contends, that no bond ever issued on this contract, then this court will not have subject matter jurisdiction."  *Id*. at 1234 n.1.

**4.**

If the Pennsylvania National Bond were the only bond alleged in the Amended Complaint, the outcome would be straightforward: the Court would lack subject matter jurisdiction.  However, it is not the only bond that pertains to the litigation.  Although the Amended Complaint emphasizes the Pennsylvania National Bond, Count I also alleges that NS&A was "aware" that, under the Miller Act, any contractor awarded a federal construction contract in excess of $100,000 must "furnish performance and payment bonds."  ECF 30, ¶ 56.  And, the Amended Complaint alleges that, because NS&A's contract with the GSA was over $100,000, "to be in compliance with the Miller Act, [NS&A] was required to furnish a payment bond."  *Id*. ¶ 57.

In fact, Count I does not refer to the Pennsylvania National Bond at all.  In other words, Count I of the Amended Complaint can reasonably be read as alleging the existence of a payment

bond posted by NS&A, as prime contractor, within the meaning of the Miller Act, and invoking this Miller Act bond as the basis for the claim.[24]

The existence of a separate Miller Act bond between NS&A, as prime contractor, and the United States would be consistent with the statutory framework.  As noted, 40 U.S.C. § 3131(b) provides: "Before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government" both performance and payment bonds.  And, the Amended Complaint alleges that NS&A's contract with the GSA exceeded $100,000.  *See* ECF 30, ¶¶ 56, 57, 129, 130.[25] Materials have not been provided to the Court indicating the total value of this contract.  But, the NS&A-ECW subcontract, which was integral to the implementation of the NS&A-GSA contract, was ultimately worth $993,840, a sum well in excess of $100,000.  *See* ECF 1-1 at 1.

When discussing subject matter jurisdiction, neither the NS&A nor the QCM motion addresses the existence of an Miller Act bond obtained by NS&A, except to say that the Pennsylvania National Bond does not qualify.  Both motions exclusively discuss the inadequacy of the Pennsylvania National Bond.  *See* ECF 35 at 8-10; ECF 36 at 8-9.

---

[24] The Amended Complaint makes similar allegations as to QCM. *See* ECF 30, ¶¶ 148, 158. But, because Count I is brought against NS&A and invokes an NS&A payment bond, the Court focuses on NS&A.

Although not a basis for this Memorandum Opinion, the Fields Group's recent motion for summary judgment (ECF 51) indicates that the Fields Group also obtained a Miller Act bond for its contract with the GSA. *See* ECF 51-3 (the bond). The Court notes that this Miller Act bond, which explicitly binds the Fields Group "to the United States of America," contrasts with the Pennsylvania National Bond, which has no such language. *Id*. at 5.

[25] As noted, at one point the Amended Complaint alleges that the NS&A-GSA contract was worth $993,840, but it cites to the NS&A-ECW subcontractor agreement. *See* ECF 30, ¶ 130.

It is understandable that the two defendants devoted their attention to the Pennsylvania National Bond, given that it is the focus of the Amended Complaint.  But, even after Delval highlighted its allegation as to an NS&A Miller Act bond in its opposition (*see* ECF 37 at 5), NS&A and QCM did not address it.  Rather, the discussion of subject matter jurisdiction in the joint reply continues to relate exclusively to the Pennsylvania National Bond.  ECF 46 at 2-4.  If there is not, in fact, any Miller Act bond for the contracts in this litigation, it would have been a simple matter for NS&A and QCM to have said so.  But, they have left unrebutted Delval's allegations in the Amended Complaint as to the existence of a Miller Act bond with respect to the NS&A-GSA contract.

The Miller Act explicitly provides that any "person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond" may bring a civil action "on the [Miller Act] payment bond."  40 U.S.C. § 3133(b)(2).  And, the case law recognizes, and NS&A and QCM do not appear to dispute, that a sub-subcontractor or supplier, such as Delval, may mount a Miller Act claim against the prime contractor on the prime contractor's Miller Act bond.  *See, e.g.*, *Arena*, 669 F.3d at 220 ("The [Miller] Act gives suppliers and subcontractors the right to sue a prime contractor in U.S. district court for the amount owed to them."); *Superior Systems*, 1994 WL 142113, at *1 ("While we have recognized that sub-sub-contractors are entitled to recover under the Miller Act, their right to sue has traditionally been limited to suit on the prime contractor's payment bond."); *United States for Use and Benefit of Olmstead Elec., Inc. v. Neosho Const. Co., Inc.*, 599 F.2d 930, 932 (10th Cir. 1979) ("[A] supplier or materialman who has a contractual relationship with a subcontractor but none with the prime contractor, shall have a right of action on the payment bond for his claim against the subcontractor."); *United States ex rel. Polied Environmental Services,*

*Inc. v. Incor Group, Inc.*, 238 F. Supp. 2d 456, 459 (D. Conn. 2002) ("[Plaintiff], as a second-tier subcontractor with a contractual relationship with [defendant], a subcontractor, would be covered by the Miller Act, assuming all other required conditions have been met. . . . While the Miller Act gives plaintiff a cause of action against the surety, nothing in that section prevents a sub-subcontractor from also suing the prime contractor or the subcontractor.") (Internal citations omitted); *Owens*, 827 F. Supp. at 1234 ("While it is true that the Miller Act gives a supplier or laborer the power to sue the surety, nothing in that section prevents the supplier from also suing the prime contractor.") (Internal citation omitted).

Of course, NS&A and QCM generally argue that the NS&A contract is not the contract for which the allegedly unpaid Purchase Order 1745 applies. But, this is a key factual question in the case and a crucial issue for the merits of Delval's claims; it is not an appropriate basis for resolving a jurisdictional dispute. *See Holloway*, 669 F.3d at 452 ("[T]he subject matter jurisdiction of a federal court is not generally resolved by concluding that the plaintiff has failed to allege an element of a federal cause of action or that the plaintiff might not be able to prove an element of a federal cause of action."); *Kerns*, 585 F.3d at 193 ("[W]hen the jurisdictional facts and the facts central to a . . . claim are inextricably intertwined, the trial court should ordinarily assume jurisdiction and proceed to the intertwined merits issues.").

*State Construction Corp.*, 385 F. Supp. 3d 449, cited by Delval, is helpful regarding whether dismissal at this juncture is appropriate. As relevant here, the plaintiff in that case argued that it could bring a Miller Act claim because it had an implied-in-fact contract with the prime contractor. *Id.* at 462. The defendants argued that the court lacked subject matter jurisdiction because the plaintiff had not adequately asserted such a contract. *Id.* at 463. Judge Grimm acknowledged that the allegations as to an implied-in-fact contract "appear thin." *Id.* at 464. But,

40

citing *Arbaugh*, 546 U.S. 500, and *Holloway*, 669 F.3d 448, he concluded that the allegations were "adequate to empower this Court to assume jurisdiction over this case." *State Construction Corp.*, 385 F. Supp. at 464.

To be sure, *State Construction Corp.* is not entirely on all fours with this case, as it turned on allegations as to the existence of a contract, rather than the existence of a Miller Act bond. But, it illustrates the principle that the Court should be hesitant to find a lack of subject matter jurisdiction when, as here, plaintiff has made some basic (and unrebutted) allegations as to jurisdiction. *See also Holloway*, 669 F.3d at 452 ("In recent years, the Supreme Court has cautioned against 'drive-by jurisdictional rulings,' that dismiss a claim 'for lack of jurisdiction when some threshold fact has not been established, without explicitly considering whether the dismissal should be for lack of subject matter jurisdiction or for failure to state a claim.'") (Internal citations omitted).

*Asbestos Abatement Contractors, Inc.,* 2012 WL 1664549, is also relevant. In that case, the district court found that the subcontractor bond was not a Miller Act bond and then dismissed the case for lack of subject matter jurisdiction, noting that the plaintiff "does not point to any other jurisdictional basis for its action." *Id*. at *5. The plaintiff there alleged a separate bond posted for the benefit of the United States, but this bond was the performance bond required by 40 U.S.C. § 3131(b)(1), rather than a payment bond required by 40 U.S.C. § 3131(b)(2), which is the only type of bond that would provide a basis for suit. *Id*. Conversely, the Amended Complaint here makes allegations as to a "payment bond" as to the NS&A-GSA contract. ECF 30, ¶ 57.

Moreover, in *Owens*, 827 F. Supp. 1232, defendants contested whether a Miller Act bond was ever issued on the contract in question. *Id*. at 1234-35. However, the court found that a Rule 12(b) motion was not the appropriate place to raise "a question of fact as to whether or not the

41

contracts were bonded." *Id*. at 1234.  The court noted: "If the facts eventually show, as the defendant contends, that no bond ever issued on this contract, then this court will not have subject matter jurisdiction." *Id*. at 1234 n.1.

The implications of accepting the defendants' arguments as to subject matter jurisdiction are significant.  As noted, a finding that no Miller Act bond exists would require the dismissal of the entire case, including the thirteen counts under State law, for which the Court would otherwise have supplemental jurisdiction.  Moreover, it would appear that the one-year statute of limitations for Miller Act claims has expired.  *See* 40 U.S.C. § 3133(b)(4); *see also* ECF 1-6 (Invoice for Purchase Order 1745, dated May 26, 2020).

A court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'"  *B.F. Perkins*, 166 F.3d at 647 (citation omitted).  In this context, the Amended Complaint appears to allege the existence of a Miller Act bond for the NS&A-GSA contract; the existence of such a bond would be consistent with the statutory requirements; and this allegation has gone unrebutted by NS&A and QCM.  Therefore, dismissal on the basis of subject matter jurisdiction is inappropriate.

The Court notes, however, that it should not be difficult to determine if a valid Miller Act bond exists in this case.  Section 3133(a) of the Miller Act provides: "The department secretary or agency head of the contracting agency shall furnish a certified copy of a payment bond and the contract for which it was given to any person applying for a copy who submits an affidavit that the person has supplied labor or material for work described in the contract and payment for the work has not been made or that the person is being sued on the bond."  Thus, via a request to the GSA, Delval should be able to obtain copies of the Miller Act bonds for any contracts implicated by this

litigation.  For their part, NS&A and QCM are presumably aware of whether Miller Act payment bonds were issued for their respective contracts with the GSA.  And, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Fed. R. Civ. P. 12(h)(3).

## B. Failure to State a Claim – Miller Act Claim

The NS&A Motion mounts a Rule 12(b)(6) attack against Count I, the Miller Act claim against NS&A.  *See* ECF 35 at 10-11.  NS&A labels its section, "The Miller Act Does Not Create a Private Cause of Action."  *Id*. at 10.  The crux of its argument is that Delval is improperly attempting to use the Miller Act "to obtain payment from an unrelated third party," NS&A.  *Id*.

"To state a claim under the Miller Act, the plaintiff must set forth facts showing that '(1) it has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished[;] . . . and (2) it has not been paid in full within 90 days.'"  *United States ex rel. Ariosa & Co., LLC v. All State Cons., Inc.*, DKC-13-3560, 2014 WL 2652853, at *3 (D. Md. June 12, 2014) (quoting *U.S. ex rel. Tenn. Valley Marble Holding Co. v. Grunley Const*., 433 F. Supp. 2d 104, 114 (D.D.C.2006)) (alterations in *Ariosa*).  At the Rule 12(b)(6) stage, I am satisfied that Delval has adequately alleged the elements of a Miller Act claim.  NS&A's arguments to the contrary are not persuasive.

In particular, Delval has alleged that it furnished material, specifically tubes, to ECW, under Purchase Order 1745.  ECF 30, ¶¶ 20, 22, 37, 58.  Moreover, Delval has alleged that the material furnished under Purchase Order 1745 was for NS&A's contract with the GSA.  *Id*. ¶¶ 20, 37, 44, 59.  Delval has also alleged that, based on representations from ECW, it reasonably believed that its material provided under Purchase Order 1745 was for NS&A's contract with the GSA; it was only after Delval fulfilled the order that ECW began presenting it with multiple other

contracts.  *Id.* ¶¶ 23-32, 37, 43, 48, 50.  As discussed above, Delval has alleged that a payment bond was furnished for the NS&A-GSA contract.  *Id.* ¶¶ 56, 57.  And, it has alleged that it has not been paid by ECW for the material it supplied under Purchase Order 1745, and that more than 90 days have passed since its work under the order was completed.  *Id.* ¶¶ 22, 38, 62.  Of course, defendants vigorously dispute many of these allegations.  But, in the Rule 12(b)(6) context, I am required to accept the allegations in the Amended Complaint as true.

As has been stated, the Miller Act provides that any "person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with the contractor furnishing the payment bond" may bring a civil action "on the [Miller Act] payment bond."  40 U.S.C. § 3133(b)(2).  And, a sub-subcontractor or supplier, such as Delval, may mount a Miller Act claim against the prime contractor on the prime contractor's bond.  *See, e.g.*, *Arena*, 669 F.3d at 220; *Superior Systems*, 1994 WL 142113, at \*1; *Olmstead Elec., Inc.*, 599 F.2d at 932; *Polied Environmental Services, Inc.*, 238 F. Supp. 2d at 459; *Owens*, 827 F. Supp. at 1234.  In Count I, Delval, as the supplier to subcontractor ECW, has lodged a Miller Act claim against an alleged prime contractor, NS&A.

NS&A argues that in Count I, "Delval wrongfully attempts to enforce the Miller Act and obtain payment from an unrelated third-party."  ECF 35 at 10.  But, this conception of NS&A is a disputed factual question, not appropriate for resolution at this stage.  As discussed, NS&A alleges in the Amended Complaint that—far from being an unrelated third-party—NS&A is the relevant prime contractor for the materials supplied by Delval under Purchase Order 1745.

NS&A also contends that Delval has pleaded contradictory facts, because it also alleges that it is unsure "what contract it provided materials for," referring to ECW's contracts with NS&A, QCM, and the Fields Group.  ECF 30, ¶ 52; *see also id.* ¶¶ 30, 49.  But, under Fed. R. Civ.

P. 8(d)(3), "[a] party may state as many separate claims or defenses as it has, regardless of consistency."  And, "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."  Fed. R. Civ. P. 8(d)(2).

Central to Delval's Amended Complaint is the claim that it provided materials to ECW pursuant to Purchase Order 1745, having been led to believe that they were for ECW's contract with NS&A.  After Purchase Order 1745 went unpaid, Delval was informed for the first time of the existence of various other contracts and contractors, making unclear the identity of the prime contractor for Purchase Order 1745.  And, according to Delval, further factual development is required to resolve this question.  ECF 37 at 8.  Likewise, NS&A argues that "[s]ince Delval does not know what Project the economizer materials were used for, it does not have a payment bond to enforce."  ECF 35 at 10-11.  Again, Delval alleges that the materials were used for the NS&A-GSA contract, and that there was a payment bond for this project.

Ultimately, the facts may not support Delval's allegations.  Indeed, some of the materials submitted with the NS&A Motion suggest that the materials supplied under Purchase Order 1745 were not for NS&A.  *See* ECF 35-4; ECF 35-5; ECF 35-6.  But, that is of no moment at this juncture.  At the Rule 12(b)(6) stage, Count I of the Amended Complaint adequately states a claim.

### C. Failure to State a Claim – Unjust Enrichment and Quantum Meruit

Delval has brought claims against NS&A for unjust enrichment (Count X) and quantum meruit (Count XI).  *See* ECF 30, ¶¶ 128-45.  Delval has also lodged claims against QCM for unjust enrichment (Count XII) and quantum meruit (Count XIII).  *See id*. ¶¶ 146-64.  In similar submissions, the NS&A Motion and the QCM Motion argue, pursuant to Rule 12(b)(6), that the Amended Complaint has failed to state these claims.  ECF 35 at 11-13; ECF 36 at 9-11.

As indicated, these claims invoke the Court's supplemental jurisdiction. "When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).

As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)).

NS&A, QCM, and Delval all assume, without discussion, that Maryland law applies. They have not alleged precisely where the last act necessary for any particular contract occurred. Nor have they identified any applicable choice-of-law provision in any contract. In the absence of any relevant allegations, and given the lack of any dispute between NS&A, QCM, and Delval as to the choice of law, I will apply Maryland law.

"The Latin term *quantum meruit* means 'as much as deserved.'" *Mogavero v. Silverstein*, 142 Md. App. 259, 274, 790 A.2d 43, 51 (2002) (quoting BLACK'S LAW DICTIONARY 1243 (6th

ed. 1990)); see also *Blanton v. Friedberg*, 819 F.2d 489, 492 (4th Cir. 1987) ("'The impact of quantum meruit is to allow a promisee to recover the value of services he gave to the defendant irrespective of whether he would have lost money on the contract and been unable to recover in a suit on the contract.'") (citation omitted); *Swedish Civil Aviation Admin. v. Project Mgmt. Enter., Inc.*, 190 F. Supp. 2d 785, 793 (D. Md. 2002) (stating that "'*quantum meruit* is a method of obtaining a reasonable value for services'") (quoting *First Union Nat'l Bank v. Meyer, Faller, Weisman, & Rosenberg, P.C.*, 125 Md. App. 1, 23, 723 A.2d 899 (1999)).

The Fourth Circuit explained in *Blanton*, 819 F.2d at 492 (quoting *W.F. Magann Corp. v. Diamond Mfg. Co.*, 775 F.2d 1202, 1208 (4th Cir. 1985)):

> "One who has rendered a service or supplied work, labor and materials under a contract with another, but who has been wrongfully discharged or otherwise prevented from so fully performing as to earn the agreed compensation, may regard the contract as terminated and get judgment for the reasonable value of all that the defendant has received in performance of the contract . . . .
>
> The underlying purpose of allowing *quantum meruit* recovery is two-fold, *i.e.* to prevent the breaching party from being unjustly enriched and to restore the aggrieved party in the contract to the position he occupied prior to entry into the contract. *Quantum meruit* merely seeks to return to the plaintiff the reasonable value of the services and goods provided to the defendant."

Under Maryland law, a claim for quantum meruit may be based on a contract implied in fact or a contract implied by law, which is often referred to as unjust enrichment. The Fourth Circuit explained in *Sanders v. Mueller*, 133 Fed. App'x 37, 42 n.3 (4th Cir. 2005): "Maryland law distinguishes between two types of quantum meruit claims, one based on an implied-in-fact contract (usually designated as quantum meruit) and the other based on an implied-in-law contract (usually designated as unjust enrichment)." *See also Mogavero*, 142 Md. App. at 275, 790 A.2d at 52. These terms have "distinct meanings." *County Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc*, 358 Md. 83, 95 n.6, 747 A.2d 600, 606 n.6 (2000); *see Mohiuddin v. Doctors*

*Billing & Mgmt. Solutions, Inc.*, 196 Md. App. 439, 447, 9 A.3d 859, 864 (2010); *Alternatives Unlimited, Inc. v. New Balt. City Bd. of School Comm'rs*, 155 Md. App. 415, 482-87, 843 A.2d 252, 291 (2004).

Delval's quantum meruit claims against NS&A and QCM are simply labelled "quantum meruit," without specifying whether they are based on an implied-in-fact contract or an implied-in-law contract. *See* ECF 30, ¶¶ 141-45, 157-64. In *Mohiuddin*, the Maryland Court of Special Appeals noted that the appellant's complaint did not specify the type of quantum meruit theory on which the appellant relied. Because the appellant had also brought an unjust enrichment claim, that court "assume[d] that appellant's complaint is not redundant and that his *quantum meruit* claim sounds in implied-in-fact contract law." *Mohiuddin*, 196 Md. App. at 447, 9 A.3d at 864 (citing *Alternatives Unlimited, Inc.*, 155 Md. App. at 488-89, 843 A.2d at 294-95). Here too, Delval has separately brought unjust enrichment claims. *See* ECF 30, ¶¶ 128-40, 146-56. Thus, I assume that Delval's quantum meruit claims are premised on an implied-in-fact contract.

A contract implied-in-fact, or an "implied contract," is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of [people]." *Maryland Cas. Co. v. Blackstone Intern. Ltd.*, 442 Md. 685, 706, 114 A.3d 686, 688 (2015). Maryland courts have said that an implied-in-fact contract arises when "specific services are requested by the defendant." *Mogavero*, 142 Md. App. at 281, 790 A.2d at 55. An implied-in-fact contract "is 'inferred from conduct of parties and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefore, and defendant, knowing such circumstances, avails himself of [the] benefit of those services.'" *Dashiell*, 358 Md. at 95 n.6, 747

A.2d at 606 n.6 (citation omitted). Notably, "'[t]he services must be rendered under such circumstances as to indicate that the person rendering them expected to be paid therefor, and that the recipient expected, or should have expected, to pay for them.'" *Mogavero*, 142 Md. App. at 277, 142 A.2d at 53 (citation omitted). "Recovery on a contract implied in fact . . . is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services." *Id.* at 276, 790 A.2d at 53.

An implied-in-fact contract "'refers to that class of obligations which arises from mutual agreement and intent to promise, when the agreement and promise have simply not been expressed in words. Despite the fact that no words of promise or agreement have been used, such transactions are nevertheless true contracts, and may properly be called inferred contracts or contracts implied in fact.'" *Mohiuddin*, 196 Md. App. at 448, 9 A.3d at 865 (quoting I Richard A. Lord, WILLISTON ON CONTRACTS, § 1.5, pp. 20-21 (1990)) (emphasis in Mohiuddin). *See also Dashiell*, 358 Md. at 94, 747 A.2d at 606 ("An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men.") (internal quotation and citations omitted); *Mogavero*, 142 Md. App. at 275, 790 A.2d at 52 ("An implied-in-fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'"); *Slick v. Reinecker*, 154 Md. App. 312, 318, 839 A.2d 784, 787 (2003) ("'The term [implied in fact contract] only means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'") (quoting *Mass Transit Admin. v. Granite Construction Co.*, 57 Md. App. 766, 774, 471 A.2d 1121 (1984)) (emphasis omitted) (bracketed comments added in *Slick*).

In contract to express and implied-in-fact contracts, a contract implied-in-law, known as a "quasi-contract," or unjust enrichment, is a "[l]egal fiction invented by common law courts to

permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *Maryland Cas. Co.*, 442 Md. at 707, 114 A.3d at 689 (emphasis and citations omitted); *see AAC HP Realty, LLC v. Bubba Gump Shrimp Co.*, 243 Md. App. 62, 70-71, 219 A.3d 99, 104 (2019); *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 4 (1981)); *Dashiell*, 358 Md. at 96-97, 747 A.2d at 607 (Unjust enrichment is a remedy "'to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided.'") (internal citation omitted).   "A successful unjust enrichment claim serves to 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'"  *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295-96, 936 A.2d 343, 352 (2007) (citation omitted); *see also Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151, 757 A.2d 108, 113 (2000).

In Maryland, a claim of unjust enrichment is established when: "(1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 389 Md. 615, 651-52, 887 A.2d 525, 546 (2005) (citation omitted); *see also Hill*, 402 Md. at 295, 936 A.2d at 351; *Dashiell*, 358 Md. at 95 n.7, 747 A.2d at 607 n.7; *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 574, 952 A.2d 304, 327, *cert. denied*, 406 Md. 444, 959 A.2d 793 (2008); *Swedish Civil Aviation Admin.*, 190 F. Supp. 2d at 792-93.  The "'burden is on the plaintiff to establish that the defendant holds plaintiff's money and that it would be

unconscionable for him to retain it.'" *Bank of America Corp. v. Gibbons*, 173 Md. App. 261, 268, 918 A.2d 565, 569 (2007) (quoting *Plitt v. Greenberg*, 242 Md. 359, 364, 219 A.2d 237, 241 (1966)).

Notwithstanding the differences between quantum meruit and unjust enrichment, NS&A and QCM pursue the same attack on both the quantum meruit and unjust enrichment claims. Specifically, they contend that the Amended Complaint does not adequately allege that Delval conferred a benefit on NS&A or QCM with the material that it furnished under Purchase Order 1745.  ECF 35 at 11-13; ECF 36 at 9-11.  Instead, they argue that the Amended Complaint indicates that Delval does not know who benefited from Purchase Order 1745, and that, in the case of NS&A, NS&A is a "wholly unrelated third party."  ECF 35 at 12.

I pause to note that NS&A, QCM, and Delval all appear to have somewhat conflated quantum meruit and unjust enrichment.  The arguments advanced by NS&A and QCM primarily refer to the elements of an unjust enrichment claim.  And, the case law cited in the briefing as to the elements of a quantum meruit claim either refers to out-of-state law, or actually refers to unjust enrichment. *See*, *e.g.*, *Star v. TI Oldfield Dev., LLC*, 962 F.3d 117, 138 n.27 (4th Cir. 2020) (citing South Carolina law); *Blanch v. Chubb & Son, Inc.*, CCB-12-1965, 2012 WL 5471224, at *6 (D. Md. Nov. 8, 2012) (although mentioning both quantum meruit and unjust enrichment, citing *Hill*, 402 Md. at 295, 936 A.2d at 351, which provides the elements for unjust enrichment).

Regardless, stating a claim of unjust enrichment requires alleging that "the plaintiff confer[red] a benefit upon the defendant." *Benson*, 389 Md. at 651, 887 A.2d at 546.  And, as to a quantum meruit claim, an implied-in-fact contract requires that the plaintiff have "render[ed] services" to the defendant, and that the defendant "avail[ed]" itself of the "benefit of those services." *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 (citation omitted).  That is, both

concepts require the plaintiff to have provided a benefit or services to the defendant.  Because this requirement is where NS&A and QCM both take issue with the Amended Complaint, I will analyze together the arguments by NS&A and QCM as to the unjust enrichment and quantum meruit claims.

At this juncture, the Court's resolution of the arguments as to unjust enrichment and quantum meruit is similar to its resolution of the arguments as to Count I.  The Amended Complaint alleges that the material Delval furnished under Purchase Order 1745 was ultimately used by NS&A as part of its contract with the GSA.  ECF 30, ¶¶ 20, 37, 44, 59, 131-34, 136-37, 145.  Likewise, the Amended Complaint alleges that the material Delval furnished under Purchase Order 1745 was ultimately used by QCM as part of its contract with the GSA.  *Id.* ¶¶ 26, 149-51, 153-54, 160-61, 163.  In other words, the Amended Complaint adequately alleges that Delval furnished materials to the defendants, which conferred a benefit upon them, or rendered services to NS&A and QCM.

NS&A and QCM are correct that Delval alleges that it is unsure as to which prime contractor defendant ultimately received the benefit of its materials.  *See* ECF 30, ¶¶ 30, 49, 52.  And, it may be that plaintiff's claims are contradictory.  But, as discussed, a Complaint may plead inconsistent or alternative claims.  *See* Fed. R. Civ. P. 8(d).  Indeed, the whole premise of Delval's case is that it believed it was supplying materials for NS&A, only to be told, after not receiving payment, that the materials actually may have been used for QCM or the Fields Group.  And, taking the allegations in the Amended Complaint as true, at least *one* of the entities—either NS&A, QCM, or the Fields Group—must have benefited from the materials supplied by Delval under Purchase Order 1745.

As Delval asserts in its opposition briefing, determination of these issues is a factual question not appropriate for resolution at this stage.  *See* ECF 37 at 10; ECF 38 at 9.  Therefore, I will deny the motions as to the unjust enrichment and quantum meruit counts.

### V.  Conclusion

For the reasons stated above, I shall construe the NS&A Motion (ECF 35) and the QCM Motion (ECF 36) as motions to dismiss, and deny them.

An Order follows, consistent with this Memorandum Opinion.

Date:   March 10, 2022                                   _____/s/_____

                                                                     Ellen L. Hollander
                                                                     United States District Judge